

**FILED**

Oct 18 2018, 5:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthony Ector, *Appellant-Defendant,* | October 18, 2018 |
| | Court of Appeals Case No. 49A02-1710-CR-2422 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Shatrese M. Flowers, Judge |
| | Trial Court Cause No. 49G20-1604-F2-12806 |

**Najam, Judge.**

## Statement of the Case

[1] Anthony Ector appeals his convictions, following a jury trial, for dealing in cocaine, as a Level 2 felony; dealing in marijuana, as a Level 5 felony; possession of a narcotic drug, as a Level 5 felony; and for being a habitual

offender. Ector raises a single issue for our review, namely, whether the trial court erred under Article 1, Section 11 of the Indiana Constitution when it admitted evidence that had been seized pursuant to a warrantless search of a vehicle, which was parked in the driveway of a residence that officers had a warrant to search and in which residence the officers had found Ector along with substantial amounts of contraband.

[2]     We affirm.[1]

## Facts and Procedural History[2]

[3]     On April 1, 2016, Indianapolis Metropolitan Police Department ("IMPD") officers executed a search warrant at a "trap house" in Indianapolis. A "trap house" is a house used "to sell narcotics," and, "if anyone stays there, it's[ ]on an infrequent basis" such that there are not "a lot of personal items there that could be traced back to an individual." Tr. Vol. II at 17. Officers would not "expect somebody to live" in such a house. *Id.* Although no one was known to live in the house being searched, the house nonetheless had bars over the windows, barricaded doors, and security cameras around the exterior. The search warrant specifically permitted officers to seize any keys found inside the residence for the purposes of "aid[ing] in the identification of the individuals

---

[1]  We held oral argument in the Lincoln Amphitheatre in Lincoln State Park in Spencer County on September 10, 2018.

[2]  In Ector's briefs on appeal, he provides citations to the record in support of his assertions of facts only at the end of paragraphs rather than at the end of sentences. This practice impedes our review as it provides lengthy citation ranges and does not clearly correlate a specific citation to a specific assertion.

involved in the trafficking of controlled substances at the residence . . . or which may provide evidence of the connection of such individuals to the residence . . . ." Ex. Vol. I at 59-60.[3]

[4] Upon entering the residence, officers observed Ector standing near a staircase and holding an AK-47 assault rifle. A nearby officer "pointed [his rifle] at Mr. Ector, clicked off the safety, and advised him [to] please drop the gun." Tr. Vol. III at 32. Ector threw his firearm toward a nearby couch and fled into another room. Officers pursued and apprehended him. Officers also detained two other individuals inside the residence: Kevin Rent and Charles Polk.

[5] Inside the residence, officers seized the following items:

- a Glock 22 handgun with an extended magazine;
- three bags containing cocaine with an aggregate weight of 146.6 grams (about one-third of one pound);
- a duffel bag and a trash bag containing marijuana with an aggregate weight of approximately 6,733 grams (just shy of fifteen pounds);
- four scales, several small plastic baggies, and items with narcotics and heroin residue on them;
- approximately $2,000 on Ector and Rent, mostly in twenty dollar bills;
- a bottle of sleeping-aid pills used to cut heroin;
- Polk's resume;
- a photograph of Ector and Polk together;
- Rent's debit card; and
- keys found in the dining room.

---

[3] Our pagination of the Exhibits Volume is based on the .pdf pagination.

[6] Outside the residence were two vehicles parked in the driveway of the residence: a Chevrolet Trailblazer and a Toyota Camry. On his person, Rent had keys to the Trailblazer and also to the front door of the house. Officers contacted the Bureau of Motor Vehicles ("BMV") to identify the owner of the vehicle based on the registration plate number. The BMV informed the officers that Rent owned the Trailblazer.

[7] Officers asked the three men who owned the keys that had been found in the dining room, but no one claimed the keys. Officers discovered that the keys opened the Toyota Camry in the driveway. A check of the Camry's registration plate number with the BMV revealed that it was registered to Anna Smith, Ector's mother.[4]

[8] One of the officers on the scene, Detective Jeremy Gates, had observed the Camry at the house on at least two prior occasions while he was conducting surveillance on the house prior to having obtained the warrant. When none of the three men claimed the Camry's keys, Detective Gates concluded that the Camry was subject to forfeiture, opened the Camry, and conducted an inventory search of it.[5] Inside, officers observed a "small bud" of marijuana on

---

[4] It is not clear from the record on appeal when officers learned that Smith was Ector's mother, but it appears to have been sometime after the search and seizure of the Camry.

[5] Although the State later filed a complaint for forfeiture of the cash found on Ector, the State's complaint did not seek to have the Camry forfeited.

"the floorboard right next to the front door." Tr. Vol. III at 75. Officers then searched the vehicle and discovered the following:

- $4,500 in cash;
- financial documents addressed to Ector;
- a ledger; and
- a key underneath the back seat.

In discovering the key inside the Camry, the searching officer had to "lift up" the back seat; no "tool[] or any sort of strength" was required to "pull [the seat] up." Tr. Vol. II at 56. Officers then tried the key on the front door of the house. The key unlocked the front door.

[9] Thereafter, the State filed numerous charges against Ector. Ector filed a motion to suppress the evidence seized from the Camry under Article 1, Section 11 of the Indiana Constitution, which the trial court denied.[6] At his ensuing jury trial, Ector renewed his Article 1, Section 11 objection to the admission of the evidence seized from the Camry,[7] but the court overruled his objection.

[10] Ector's theory in defense of the charges was that he was a casual visitor at the residence, and, in effect, he was simply at the wrong place at the wrong time when the search warrant was executed. The jury rejected his defense and,

---

[6] Ector's written motion to suppress was based on both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Appellant's App. Vol. II at 77. However, at the suppression hearing, he clarified that his motion was "under the Indiana Constitution." Tr. Vol. II at 96.

[7] In his objection at trial, Ector expressly "concede[d] that [the search of the Camry was] permitted under the [F]ourth [A]mendment . . . ." *Id.* at 242.

following the jury's verdict, the trial court entered judgment of conviction against Ector for dealing in cocaine, as a Level 2 felony; dealing in marijuana, as a Level 5 felony; possession of a narcotic drug, as a Level 5 felony; and for being a habitual offender. The court then sentenced Ector to an aggregate term of thirty years in the Department of Correction. This appeal ensued.

## Discussion and Decision[8]

### *Standard of Review and Article 1, Section 11*

[11] Ector's argument that the State violated his "Article 1, Section 11 rights" raises a "question[] of law we review *de novo*."[9] *Redfield v. State*, 78 N.E.3d 1104, 1106 (Ind. Ct. App. 2017) (quotation marks omitted), *trans. denied*. "[A]s a general matter[,] determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal," while "findings of historical fact" underlying those determinations are reviewed "only for clear error." *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *see McIlquham v. State*, 10 N.E.3d 506, 511 (Ind. 2014)

---

[8] Insofar as Ector suggests on appeal that his Fourth Amendment rights were also violated, he has not preserved that issue for our review. Similarly, in his brief on appeal Ector argues that the seizure of the key to the Camry from inside the residence was not within the scope of the warrant. Ector did not raise that argument in the trial court. *See* Tr. Vol. II at 242-49. Accordingly, we do not consider that purported issue. Finally, we also do not consider Ector's standing under Article 1, Section 11. While Ector argues in his brief that he had standing to object to the admission of evidence seized from his mother's Camry, the State does not argue otherwise in its brief on appeal.

[9] Insofar as Ector suggests in his brief that he is appealing from the denial of his motion to suppress, Ector is incorrect. The evidence was presented to a jury, and Ector objected to the admission of the evidence at trial. "Thus, he is appealing from that admission, not from the prior denial of his motion to suppress." *Redfield v. State*, 78 N.E.3d 1104, 1106 n.3 (Ind. Ct. App. 2017), *trans. denied*. Further, insofar as the parties' briefs suggest that our review is for an abuse of discretion, which is "our typical standard of review for challenges to the admission of evidence," *id.*, the parties again are incorrect. "[T]he issues in this appeal are constitutional questions and, as such, we review them *de novo*." *Id.*

(applying that standard under Ind. Const. art. 1, § 11). "In other words, we review whether reasonable suspicion or probable cause exists under a standard similar to other sufficiency issues—whether, without reweighing the evidence, there is substantial evidence of probative value that supports the trial court's decision." *Redfield*, 78 N.E.3d at 1106 (quotation marks omitted).

[12] Regarding Article 1, Section 11, our Supreme Court has explained as follows:

> In recent years, this Court has expressed that "[t]he legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005) (citing *Moran [v. State]*, 644 N.E.2d [536, 539 (Ind. 1994)]). To determine whether a residential entry violated Article 1, Section 11, we apply a "totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions." *Duran v. State*, 930 N.E.2d 10, 17 (Ind. 2010). A more elaborate explanation and methodology for evaluating such reasonableness is provided in *Litchfield*:
>
> > In sum, although we recognize there may well be other relevant considerations under the circumstances, we have explained reasonableness of a search or seizure as turning on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.
>
> 824 N.E.2d at 361.

*Lacey v. State*, 946 N.E.2d 548, 550 (Ind. 2011) (some citations omitted).

[13] Ector contends on appeal that his Article 1, Section 11 rights were violated in two respects. First, he argues that the State's purported need to inventory the Camry was merely a pretext to engage in an unlawful evidentiary search. Second, he argues that, regardless of whether the inventory search was pretextual, the search was unconstitutional under the three *Litchfield* factors. We address each of Ector's arguments in turn.

### *Inventory Search*

[14] The parties first dispute whether the seizure of the evidence from within the Camry was lawful under the inventory-search exception to the warrant requirement of Article 1, Section 11. "A valid inventory search is an exception to the warrant requirement." *Whitley v. State*, 47 N.E.3d 640, 645, 649 (Ind. Ct. App. 2015), *trans. denied*. "Police are permitted to conduct a warrantless search of a lawfully impounded vehicle if the search is designed to produce an inventory of the vehicles contents." *Id.* The rationale for an inventory search is three-fold: (1) protection of private property in police custody; (2) protection of police against claims of lost or stolen property; and (3) protection of police from possible danger." *Id.*

[15] "[T]he test of constitutionality in inventory cases is reasonableness." *Id.* at 645. As we have explained:

> In determining the reasonableness of an inventory search, we examine all the facts and circumstances of the case. We consider the propriety of the impoundment giving rise to the search and the scope of the inventory search itself. The search must be conducted pursuant to and in conformity with standard police

procedures. Evidence of established local policy and procedure is required "to ensure that the inventory is not a pretext for a general rummaging in order to discover incriminating evidence."

*Id.*

[16] As such, "proper impoundment is the 'threshold question' to [a] valid inventory search." *Wilford v. State*, 50 N.E.3d 371, 374 (Ind. 2016). As our Supreme Court has further explained:

> Impoundment is reasonable if it is authorized either by statute or the police's discretionary community-caretaking function. Impoundment pursuant to a statute is necessarily reasonable because the Legislature has deemed that citizens' privacy interests in their cars yield to State interests in those circumstances, making police inventorying a necessary collateral administrative function. Discretionary impoundment, by contrast, is an exercise of the police community-caretaking function in order to protect the car and community from hazards. Discretionary impoundments, too, may be reasonable— but . . . they are vulnerable to constitutional reasonableness challenges because of their potential for misuse as pretext for warrantless investigative searches under the guise of inventory. Unless the impoundment is proper, then, an inventory search is per se unreasonable and any contraband found during the search is inadmissible "poisoned fruit."

*Id.* (citations omitted).

[17] Ector first contends that the decision to impound the Camry was improper because the "decision was made to place a forfeiture hold on the Camry before the police had sufficient evidence" to do so. Appellant's Br. at 20. Specifically,

he asserts that the State "needed to further investigate whether the car could . . . be forfeited" by "taking the house key from the car and inserting it into the lock." *Id.* at 18, 20. In other words, Ector contends that the nexus required under Indiana Code Section 34-24-1-1(a)(1) (2018) was not established until after the key found in the car was shown to unlock the residence.

[18] We cannot agree. The key discovered within the Camry had no bearing on the officers' decision to impound the Camry, which decision had been made prior to opening the Camry, searching it, and finding the house key. Rather, the impoundment decision was based on the arrests of those at the residence, that the residence was not a manufacturing setting, and the reasonable likelihood that the Camry had been used in the transportation of contraband.

[19] Indiana Code Section 34-24-1-1(a)(1) permits an officer to seize for purposes of forfeiture any vehicle that is "used . . . by the person . . . in possession of [it] to transport or in any manner facilitate the transportation of" a controlled substance. Such a seizure is permissible where, as here, "the seizure is incident to a lawful[ ]arrest." I.C. § 34-24-1-2(a)(1)(A); *see also Serrano v. State*, 946 N.E.2d 1139, 1142-43 (Ind. 2011) ("to sustain a forfeiture the State must demonstrate" a "nexus" between "the property sought" and "one of the enumerated offenses under the statute"). And IMPD policy likewise permits a vehicle to be towed and impounded if that vehicle was "operated by [a] person under custodial arrest for any charge." Ex. Vol. I. at 29.

[20] There is no dispute that Ector, Rent, and Polk were under lawful arrest when officers decided to impound the Camry. And the decision to impound the Camry was reasonable in light of the facts before the officers at the scene. Their decision was supported by the substantial amounts of contraband and firearms found within what was otherwise an apparently abandoned trap house. Further, the Trailblazer, the only other vehicle at the residence, belonged to Rent, while the Camry was registered to a third party not present at the residence, whom officers later learned to be Ector's mother. And Detective Gates had twice previously observed the Camry at the residence. In light of the facts before the officers, we agree with the State on appeal that "[t]he only reasonable conclusion is that the vehicles on the scene were used to transport, and/or facilitate the transport, the drugs to the trap house for purposes of dealing." Appellee's Br. at 17. Accordingly, the decision to impound the Camry was reasonable and, thus, constitutional.

[21] Nonetheless, Ector also contends that the officers' search of the Camry "violated IMPD policy" because it was "excessive in scope and unreasonable." Appellant's Br. at 20. In support of that position, Ector notes that IMPD's policy on inventory searches states that such searches "should not be motivated by an officer's desire to investigate and seize evidence of a criminal act," and that the policy requires opening locked areas of the vehicle only "[i]f a key is available." Ex. Vol. I at 32. Ector then asserts that the search here, which involved lifting up the back seat to reveal the house key, was excessive under IMPD's policy.

We cannot agree that the searching officer's lifting of the back seat was excessive under IMPD's policy. The policy language does not prohibit any such act, nor does the policy limit an inventory search to a visual search only. Further, the searching officer testified to the trial court at the suppression hearing that "it's a common practice . . . to search the entire vehicle," which included "underneath the rear seat . . . ." Tr. Vol. II at 55-56. Thus, the evidence is sufficient to support the trial court's judgment on this issue.[10] *See Redfield*, 78 N.E.3d at 1106.

### *Article 1, Section 11 Factors*

The parties also dispute whether the search of the Camry was lawful under the three Article 1, Section 11 factors noted above. Again, those factors are (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs. *E.g.*, *Litchfield*, 824 N.E.2d at 361.

In support of his position on this issue, Ector asserts that the degree of concern, suspicion, or knowledge that a violation had occurred "was low and the intrusion was great when the car was impounded and the house key was used to further the investigation into Anthony Ector's role in the trap house . . . ."

---

[10] We need not consider the State's alternative argument on appeal that, because officers immediately observed marijuana on the floor of the car upon opening the car door, the officers had probable cause to conduct a warrantless search of the entire vehicle regardless of the language of the IMPD policy.

Appellant's Br. at 25 (citations to the record omitted). And while Ector then concedes that "the police had a clear need for evidence from the Camry," he asserts that "it was unreasonable to perform a pretextual search lacking in probable cause in lieu of obtaining consent or a warrant." *Id.*

[25] We cannot agree with Ector's assessment. Rather, we agree with the State that the Article 1, Section 11 factors weigh heavily in the State's favor. As the State summarizes on appeal, the degree of suspicion here was high:

> [Ector] and his two co-defendants were found in a trap house with barred windows and video surveillance. When police entered the house, [Ector] was attempting to protect the 146 grams of cocaine[] and almost 15 pounds of marijuana with a stolen AK-47. Det. Gates testified that[,] based on his training and experience, the "vehicles were utilized to transport, or were financed directly through the sales of[,] narcotics." There were only two cars in the driveway and three individuals inside. Further, Det. Gates[] indicated that[,] while conducting surveillance on the house, he [had] observed the Camry at the trap house on multiple occasions.

Appellee's Br. at 24-25 (citations to the record omitted).

[26] Further, any intrusion into Ector's privacy in the search of his mother's vehicle was minimal, and nothing about the manner or timing of the search intruded on Ector's ordinary activities. And the needs of law enforcement also weigh in the State's favor. Again, the officers were justified in taking the Camry into their custody for forfeiture, and, thus, they had an established need to inventory the

Camry pursuant to that forfeiture. In sum, the search of the Camry was reasonable under Article 1, Section 11.

[27] Accordingly, we cannot say that the trial court's admission of the evidence seized from the Camry violated Ector's rights under Article 1, Section 11, and we affirm Ector's convictions.

[28] Affirmed.

Bailey, J., and May, J., concur.